52 CCPA

**Application of William E. PORTZ.**
**Patent Appeal No. 7395.**

United States Court of Customs
and Patent Appeals.
May 6, 1965.

Slough & Slough, Cleveland, Ohio (J. H. Slough, Cleveland, Ohio, of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for Comr. of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from a decision of the Board of Appeals affirming the examiner's rejection of claims 4 and 6 of appellant's application for patent[1] on a reel mounting means for fishing rods. No claims have been allowed.

Claim 4 is reproduced as illustrative:

"The combination with a fishing rod having a tubular handle member for attaching a reel thereto comprising an elongated tubular guide element telescoped within the said tubular handle member and longitudinally slidable with respect thereto, said guide element having reel base seating means protruding outwardly thereof, reel base seating means secured to said tubular handle member forwardly of the said guide element and in spaced relation thereto, said guide element extending within said tubular handle member a substantial portion of the length of said handle member, each of said reel base seating means being disposed in substantially longitudinally spaced aligned relation to each other, a compression spring, a pair of substantially U-shaped spring hanger elements, each hanger element hav-

1. Serial No. 20,695 filed April 7, 1960.

ing a yoke portion and hook end portions, said hanger elements being telescoped within the said compression spring, the hook ends of each hanger element being hooked over an opposite end convolution of said spring and the yoke ends thereof protruding from opposite ends thereof, each said reel base seating means having pin means projected transversely therethrough, said transverse pin means being disposed in spaced parallel relationship and each yoke secured to an opposite one of said transverse pin means.

Figure 2 of appellant's drawings is reproduced below:

Fig. 2.

Appellant discloses a device which comprises a sleeve 9 attached to the butt end of a fishing rod 1, with a ring 4 attached to the sleeve by a pin 6 and having pocket 24 to accommodate the toe of a reel base. Cooperating pocket 5 to accommodate the opposite end or heel of the reel base is upstruck from a cap 3 secured to tubular guide member 8 by a pin 11 parallel to pin 6. Member 8 is telescoped within sleeve 9 and is biased towards telescoped position by spring device 12. Spring 12 comprises an exterior compression spring element 22 and a pair of internally disposed hanger elements 13 and 19. The hanger elements have yoke portions 18 and 20 located at opposite ends of compression spring 22 and hook portions 15 and 21 which engage, respectively, the opposite end convolutions of spring 22. When the yoke portions are disposed over pins 6 and 11, the pockets 24 and 5 are urged toward each other by the spring device to secure the reel to the rod.

The references cited are:

Baird discloses attaching means for fishing reels with a sleeve affixed to a fishing rod and a band having a pocket attached to the sleeve to serve as a stationary pocket for the toe of a reel base. To accommodate the heel of the reel base there is a movable pocket formed in a band secured to a tubular carrier by a threaded pin. A tension spring with one end engaged over the threaded pin and the other over a hook mounted on a partition within the sleeve serves to draw the tubular carrier into the sleeve and hold the pockets in engagement with the reel base. The reference shows a construction for retaining the movable pocket out of reel engaging position.

A tongue on the carrier fits within a longitudinal groove in the sleeve. The pockets can be locked apart in a nonengaging position by rotating the tubular carrier in the sleeve, thus moving the tongue from the longitudinal groove to an annular groove and preventing longitudinal movement of the carrier within the sleeve.

Gold shows a fishing rod having an end on which are mounted a tubular member which cooperates with a flattened por-

Baird et al. 1,902,749    March 21, 1933
Gold    1,591,035    July 6, 1926
Welch    577,801 February 23, 1897

tion on the rod end to form a stationary reel base pocket, and a tubular member telescoped over the rod end which co-operates with a flattened portion thereof to form a movable reel base socket. The movable socket is biased toward reel base engaging position by an internal tension spring having an end engaged over a pin. The pin passes through the sleeve and rod end securing these parts together.

Welch discloses a spring, illustrated by figure 2, reproduced below:

Fig. 2

As noted from the above drawing, the spring comprises a compression spring coil C′ having mounted thereon two loops J,J. Each loop has an eye J′ at one end and hooks L,L at the other. The loops are disposed in the coil in opposing relation with the hooks L,L engaging the convolutions at opposite ends of coil C′ and the eyes J′ extending beyond opposing ends of the coil. The Welch spring was designed as a flexible connection between a coupling pin and an operating lever for use in a car-coupling apparatus.

The examiner rejected the claims in issue on Baird in view of Welch and Gold. He held that it would be an obvious expedient shown to be old in view of the pins in Gold, to provide Baird with duplicate spring engaging pin means on both ends of the reel in lieu of the pin and hook means shown in Baird. He further held that to substitute for the tension spring means in Baird the spring suggested in Welch's figure one, if desired, would involve the "mere selection and use of known expedients and as such would be obvious to a person having ordinary skill in the art." The board was in agreement with the examiner, pointing out additionally, however, that:

"Regardless of the combinations in which they are assembled the spring means of Baird et al. and Welch have similar resilient force exerting functions. It is well known that the Welch type spring means is used where distortion or twisting is undesirable."

We think, as the solicitor suggests, that the controlling issue here is whether use of the Welch spring in place of the tension spring in the Baird structure would be suggested to one of ordinary skill in the art of designing fishing rods with reel securing means.

There can be no doubt that Welch discloses a spring of the same type as that disclosed by appellant. In fact, appellant so concedes. Appellant contends, however, that Welch represents non-analogous art and that to use the Welch spring in Baird would incapacitate the latter's construction.

While it is true that the Welch invention, as stated in the specification, relates to improvements in car-couplers "and more particularly to devices for properly operating and controlling the coupling mechanism," it is not limited in its disclosure to a coupling mechanism for cars. The drawing, herein reproduced, shows a spring device separate and apart from the coupling combination. The patentee describes the spring as "my improved spring." The specification goes into considerable detail in its description of the features of the spring

alone, stating that it may also be used with other forms of operating levers. It would be obvious to one of ordinary skill in the art of mechanics to observe and evaluate the characteristics of the Welch spring apart from its relation to the area of car-couplings. The use of such a spring would be suggested for adaptation to whatever environment in which it would likely serve a useful purpose. It seems clear that the art of Welch not only involves car-couplings but also the art of spring devices generally. It would appear manifest that one seeking to design an improved reel locking device would be expected to consult the art relating to spring devices.

We note the fact, but not the significance, of appellant's observation that the spring in Welch is connected to a locking device at one end and to a lever at the other end and not to a fixed position at one end and a longitudinally slidable element at the other end. The function of the spring is to apply tension. If it would apply tension upon movable points, certainly it would apply tension between points with which it connects even though one of the points be securely fixed as called for by the claims in issue.

Appellant predicates his argument that the substitution of the Welch spring in the Baird device would "incapacitate" the Baird construction on the fact that the spring in Welch cannot be rotated and hence the reel seating pockets in Baird could not be aligned. As noted, Baird has a pocket retention feature which holds the pocket out of reel engaging position while the reel is being mounted or dismounted. However, the Baird device is operable, in the same way as appellant's, without using the pocket retention feature, and in so using the Baird device, alignment is preserved. The pocket retention feature of Baird is a convenience and not a necessity. It may be used or not, as the operator may prefer. If not used, it operates the same way as appellant's device. It is seen, therefore, that appellant has eliminated the locking elements and their function. We perceive no unobvious or unexpected results attending such elimination. In re Pedley, 212 F.2d 199, 41 CCPA 868.

We have no doubt that it would be obvious to one skilled in the art that the improved Welch spring would be suggested in lieu of the simple tension spring shown in Baird. The advantages of such a spring are amply discussed in the Welch specification. This would seem to supply suggestion and incentive for substitution. We perceive no reason of record to question, and apparently appellant does not question, the board's statement that the Welch spring was well known to be useful "where distortion or twisting is undesirable."

We find no reversible error in the holding of the board that it would

" * * * be obvious to a person of ordinary skill in the art and a knowledge of the art before us to mount a torsion free spring in the Baird et al. fishing pole. Such a construction would not patentably distinguish from the structure defined by claims on appeal."

The decision of the board is affirmed.

Affirmed.